Jerome H. LEMELSON,
Plaintiff–Appellee,

v.

GENERAL MILLS, INC., General Mills Fun Group, Inc., Marvin Glass & Associates, Defendants,

and

Mattel, Inc., Defendant–Appellant.

No. 90–1359.

United States Court of Appeals, Federal Circuit.

June 30, 1992.

Rehearing Denied Aug. 11, 1992.

Suggestion for Rehearing In Banc Declined Sept. 11, 1992.

Gerald D. Hosier, Law Offices of Gerald D. Hosier, Ltd., Chicago, Ill., argued, for plaintiff-appellee.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., argued, for defendant-appellant. With him on the brief was J. Michael Jakes. Also on the brief were Herbert M. Wachtell, Warren R. Stern and Stephen R. Neuwirth, Wachtell, Lipton, Rosen & Katz, of New York City, of counsel.

Before RICH, NEWMAN and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a patent infringement suit by Jerome H. Lemelson alleging infringement by Mattel's 'Hot Wheels' toy. Over $70,000,000 in damages and interest was awarded Mr. Lemelson (Lemelson). Defendant Mattel, Inc. (Mattel) appeals from the judgment entered, after a jury trial, by the United States District Court for the Northern District of Illinois, Eastern Division, dated May 8, 1990.[1] The District Court, pursuant to jury verdict, adjudged Mattel to have infringed claim 3 of Lemelson's reissue patent, Re. 32,106, and awarded jury-determined damages plus interest. The District Court denied Mattel's motion for judgment notwithstanding the verdict

1. No. 77–C–4558.

or for a new trial, and rendered judgment for Lemelson.

## I. BACKGROUND

### A.

The claimed invention involved in this case relates to a flexible track upon which toy cars run. Mattel's 'Hot Wheels,' the first major commercialization of such a toy, became one of the most commercially successful toys in history.

Lemelson's original patent application for a "Toy Track" was filed in the U.S. Patent and Trademark Office (PTO) on May 14, 1967, with one independent claim and eight dependent claims. That original independent claim, reproduced below, consisted of what would later become the first five of the seven clauses in claim 3 of the reissue patent[2]:

A trackway toy comprising in combination with a toy vehicle having plural wheels,

(a) a trackway including a base having an upper surface along which said vehicle may travel,

(b) guide means for defining a path of travel for said vehicle on said upper surface,

(c) said guide means including at least one formation molded integral with said upper surface of said trackway and providing plural parallel extending surfaces against which respective wheels of said vehicle may ride to define said path in travel therealong,

(d) said base and said guide means being integrally molded of flexible plastic material and having the characteristic such that said base is normally incapable of self-support whereby said trackway will easily conform to non-planar surfaces and

(e) rigid support means for said trackway disposed adjacent said base and en-

gaging a surface thereof in a manner to predetermine the shape of the base.

During prosecution of the 1967 application, Lemelson's counsel cited to the PTO several patents found in a prior art search, including the Gardiol patent, U.S. Patent No. 2,862,333. Lemelson's counsel described Gardiol as a track construction which includes internal wires to maintain its desired shape, while Lemelson's application was said to be directed to a flexible plastic track which was "normally incapable of self-support so that the trackway could be made to readily conform to non-planar surfaces."

The Examiner rejected independent claim 1 and three of its dependent claims as being anticipated by Gardiol. The remaining five dependent claims, which added further limitations, were allowed subject to being written in independent form. Subsequent to a personal interview with the Examiner, Lemelson's counsel filed an amendment which re-wrote the allowed claims in independent form, and cancelled the rejected claims.

The application was later allowed, and issued as U.S. Patent No. 3,451,161 (the '161 patent) on June 24, 1969. The patent, "Toy Track and Vehicle Therefor," is directed to a "toy guideway or track and vehicle for riding thereover." Claim 3 of the '161 patent, as rewritten, which is the same as claim 3 of the reissue patent[3], reads:

3. A trackway [toy] comprising in combination with a toy vehicle having plural wheels,

[a] a trackway including a base having an upper surface along which said vehicle may travel,

[b] guide means for defining a path of travel for said vehicle on said upper surface,

[c] said guide means including at least one formation molded integrally with said upper surface of said trackway

---

**2.** See claim 3 infra p. 1203.

**3.** In the reissue claim 3, the preamble reads "A trackway comprising" rather than "A trackway toy comprising". The deletion of "toy" appears

from the record of the proceedings before the PTO to have been an inadvertent error when the patent was printed rather than an amendment to the claim.

and providing plural parallel extending surfaces against which respective wheels of said vehicle may ride to define said path of travel therealong,

[d] said base and said guide means being integrally molded of flexible plastic material and having the characteristic such that said base is normally incapable of self-support whereby said trackway will easily conform to non-planar surfaces and

[e] rigid support means for said trackway disposed adjacent said base and engaging a surface thereof in a manner to predetermine the shape of the base,

[f] said guide means include a pair of spaced apart runner portions for defining the pathway of a vehicle moving over said track,

[g] said spaced apart runner portions include upwardly extending rails for guiding the wheels of a vehicle.

(The bracketed lettering before each clause has been added for convenience in referencing.)

A comparison of original cancelled claim 1 and what is now reissue claim 3 shows that the first five clauses—[a] through [e]—of original cancelled claim 1 are identical to the first five clauses of reissue claim 3. As we shall discuss, it was the addition of the final two clauses—[f] and [g]—that overcame the problem of anticipation by Gardiol, and upon the meaning of which this case turns.

### B.

Returning to the sequence of events, by 1967 Mattel started independent development of a track and car product for entry into the market for small metal cars, such as the popular 'Matchbox' cars. During the preliminary stages of development of the Hot Wheels cars and track system, Max E. Shirk, Mattel's outside counsel, had a prior art search done, covering a number of the track's features. The search was directed to novelty and state-of-the-art.

In a letter dated October 6, 1967, Shirk reported that twenty-six prior art patents were found, including Gardiol. (Lemelson's patent had not yet issued, and was therefore not found in this search.) Gardiol was described as disclosing a "deformable toy track" made from a "flexible plastic material" which was "capable of undergoing a three-dimensional deformation." Shirk concluded that, in light of the prior art, only "a few relatively small features [of the Mattel track and its accessory items] may be patentable." Two of these features stemmed directly from the track: 1) the 'dishing' of the juncture of the upstanding side walls with the upper surface of the track in order to minimize contact of the car wheels with the side walls, and 2) the use of continuous, parallel channels on the lower·surface of the track for use in connecting consecutive track sections. Mattel subsequently obtained a number of patents covering various specific technical features of the Hot Wheels system, but did not apply for a patent covering the track itself.

Mattel introduced the Hot Wheels cars and track system at the February 1968 toy fair. The Hot Wheels products were a hit, and, as noted, became one of the most popular and commercially successful toys in United States history.

Lemelson conceded that he knew about Hot Wheels at least by late 1968—the year before his patent issued. His first contact with Mattel regarding a license under the '161 patent was in September of 1970, more than a year after the patent issued. Despite Lemelson's repeated efforts over a period of time, Mattel steadfastly denied any interest in such a license. At one point Lemelson told Mattel that he was considering legal action for patent infringement. He also told Mattel that he was "extremely busy" in other patent litigations and in his business activities "relating to patent licensing," but that he would "eventually" get around to suing Mattel.

Lemelson testified that he subsequently began to "look around for what would be ... a good attorney to handle a litigation against Mattel." He eventually contacted an attorney, Carl Pearson, after reading about him in the New York Times. It was not until late 1977 that Lemelson and Pear-

son came to an agreement, and the litigation was ready.

Lemelson filed suit in the Northern District of Illinois in December, 1977, claiming that Mattel's Hot Wheels toys infringed the '161 patent. Lemelson filed his reissue application on December 16, 1980, in light of prior art cited by Mattel in the course of the litigation. In January, 1983, Mattel consented to a stay of the litigation pending disposition of the reissue. Mattel participated in the reissue proceedings to the fullest extent permitted by the PTO rules. The Examiner and later the PTO Board of Appeals ultimately denied the reissue application, despite amendments which changed several of the claims and added others, on the grounds that the claimed inventions would have been obvious in view of various combinations of prior art, including Gardiol.

### C.

Lemelson then brought an action in the District Court for the District of Columbia under 35 U.S.C. § 145, challenging the PTO decision. That court concluded that the invention of the rejected claims would not have been obvious, and held that the reissue application should be granted. *Lemelson v. Mossinghoff,* 225 USPQ 1063, 1985 WL 1787 (D.D.C.1985). The District Court relied in part on evidence of the "commercial success of the highly flexible Hot Wheels trackway toy vehicle combination covered by [Lemelson's] Reissue Application." *Lemelson,* 225 USPQ at 1067. The PTO Commissioner filed but then abandoned an appeal to this court, and the reissue patent issued April 8, 1986. Throughout the reissue proceedings, claim 3 remained unchanged.

### D.

The infringement suit in the Northern District of Illinois was reactivated and went to trial in October, 1989. Pursuant to Mattel's motion *in limine* which was granted by the District Court, the jury was apprised only of conclusory facts regarding the outcome of the reissue proceedings— the details were not disclosed due to the potential for excessive prejudice against Mattel, who was not a party to the reissue suit, outweighing the relevance of the proceedings.

At the close of Lemelson's case, Mattel filed a motion for directed verdict on the grounds that: 1) the prosecution history prevented a claim scope construction which could support Lemelson's assertion of infringement; 2) Lemelson failed, as a matter of law, to prove infringement; 3) the patent was invalid as anticipated under 35 U.S.C. § 102(b); and 4) the doctrines of laches and estoppel barred Lemelson's suit against Mattel. At the close of all evidence, Mattel filed another motion for directed verdict which renewed the earlier motion and added grounds further asserting invalidity due to: 5) anticipation of the claimed invention by Gardiol; 6) obviousness of the claimed invention in view of the prior art; and 7) failure to comply with 35 U.S.C. § 112, demonstrated by a lack of having distinctly claimed the subject matter which Lemelson regarded as his invention. The District Court delayed deciding these motions until after the trial concluded.

The jury answered the following interrogatories posed by the trial court:

1) Does defendant Mattel's trackway system contain each and every element of Claim 3 of plaintiff Lemelson's patent? [yes];

1a) Is each element of Claim 3 or its substantial equivalent found in Mattel's trackway system? [yes];

2) Did defendant willfully infringe Claim 3 of plaintiff's patent? [yes];

3) Does the Italian Gardiol patent No. 511980 disclose all of the elements of Claim 3 of plaintiff's patent? [no];

4) Would the subject matter of Claim 3 of plaintiff's patent have been obvious in May 1967 to a person having ordinary skill in the art of toy track and car manufacture? [no];

5) Was the subject matter of Claim 3 of plaintiff's patent on sale prior to May 4, 1966? [no];

6) Was the subject matter of Claim 3 of plaintiff's patent described in a printed publication prior to May 4, 1966? [no]; 7) Was the subject matter of Claim 3 clearly and distinctly claimed by plaintiff? [yes].

The same jury, in the second part of the bifurcated proceedings, awarded damages of $24,780,000.

The District Court then denied Mattel's motions for directed verdict and judgment notwithstanding the verdict or for a new trial, and entered judgment for Lemelson. The District Court also granted Lemelson's motion for prejudgment interest, using the prime rate compounded quarterly and without accounting for any tax-effects, to add $46,476,690 in interest for a total award of $71,256,690. The District Court denied Lemelson's motion for increased damages or attorney fees.

Mattel, in appealing to this court, raises the following issues for review: 1) the court's construction of, and instructions to the jury regarding, the scope of Lemelson's claim in light of the prosecution history generally and in light of the Gardiol patent, specifically; 2) the laches defense; 3) invalidity of the patent claim for indefiniteness under 35 U.S.C. § 112 (1988), as a matter of law; and 4) calculation of prejudgment interest at the prime rate, compounded quarterly, without regard for tax effects. We need address only the first of these issues in order to decide this appeal.

## II. DISCUSSION

### A.

It is elementary in patent law that, in determining whether a patent is valid and, if valid, infringed, the first step is to determine the meaning and scope of each claim in suit.[4] While there may be underlying fact questions involved, the ultimate conclusion about the meaning and scope of a claim is, like contract interpretation, a question of law. Once the claims are properly understood, a determination can be made whether a particular claim 'reads on' the accused structure or process.

In determining the meaning of a claim, it is necessary to examine closely the language of the claim, the specification, and the prosecution history. See, e.g., Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1569–71, 219 USPQ 1137, 1140–42 (Fed.Cir.1983). This is particularly true if, as is often the case, a dispute exists as to how language of the claim should be interpreted and the claim as a whole construed. The prosecution history gives insight into what the applicant originally claimed as the invention, and often what the applicant gave up in order to meet the Examiner's objections. Prosecution history is especially important when the invention involves a crowded art field, or when there is particular prior art that the applicant is trying to distinguish.

Thus the determination of the scope of the claim—its interpretation and proper construction—while denominated a question of law is in many cases based on the facts regarding the patent's history. When these matters are placed before a trial judge for decision—a trier of fact who is also a law-giver—the sequence of decision-making is easy to maintain. But when a question of infringement is given to a jury, there is a special burden placed on the trial judge—as well as the parties—to ensure that the second step in the process, that of comparing the claims to the accused product or process, does not cause the first step, interpreting the claims properly, to get short shrift. The underlying factual issues in dispute become the jury's province to resolve in the course of rendering its verdict on infringement. See, e.g., Tol-O-Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H., 945 F.2d 1546, 1549–50, 20 USPQ2d 1332, 1335–36 (Fed.Cir.1991). If challenged, the jury's determination is reviewed according to the generally established rules for review of jury verdicts, first by the trial court on

---

4. Just as elementary, the same interpretation of a claim must be applied to all validity and infringement issues in the case. See, e.g., W.L.

Gore & Associates, Inc. v. Garlock, Inc., 842 F.2d 1275, 1279, 6 USPQ2d 1277, 1280–81 (Fed.Cir. 1988).

motion for JNOV, and by then this court on appeal.

### B.

The standard of review for this court when reviewing a trial judge's denial of a motion for JNOV requires us to decide for ourselves whether reasonable jurors viewing the evidence as a whole could have found the facts needed to support the verdict in light of the applicable law. If we conclude that no reasonable findings of fact, supported by substantial evidence, could support the verdict that was incorporated into the trial court's judgment, then we must conclude that the trial court erred in not granting the motion for JNOV. *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1512, 220 USPQ 929, 935–36 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1547–48, 220 USPQ 193, 198 (Fed.Cir.1983). *See generally*, 5A Moore's Federal Practice ¶ 50.15 (2d ed. 1991 & Supp.1991–92).

In the present case, the jury was adequately instructed to consider and decide the factual questions necessary to interpret the scope of the claims before deciding the issue of infringement. The instructions included a specific direction to consider the prosecution history of the patent, and to "exclude any interpretation that may have been disclaimed or given up during prosecution, in order to obtain the allowance of the claim." Finding no problem with the jury instructions, we are left to consider whether substantial evidence, in light of the applicable law, supports the jury's verdict.

### C.

The first five clauses in claim 3, *see supra* p. 1203, comprised a separate claim which had been rejected by the Examiner as anticipated by Gardiol, *see supra* pp. 1203–1204. Lemelson abandoned that 5–clause claim, and accepted the issuance of a claim comprised of the 5–clause claim supplemented with two additional clauses. It was that supplemented claim that issued (and later reissued) as claim 3.

### 1. The Prosecution History and the Prior Art

Gardiol discloses a sectional toy track, having longitudinal cores within sidewalls to allow sequential engagement, on which a toy vehicle can freely move. Gardiol's specification describes the track as being readily shaped and set in any desired form (as allowed by the cores), with the lateral movement of a toy vehicle riding along the track being limited by the upwardly extended sidewalls.

The PTO at different times concluded that Lemelson's claim 3 (the original cancelled claim with the added two clauses) *was* patentably distinguishable from the prior art (the original examiner), and *was not* patentably distinguishable and was therefore invalid for obviousness (the reissue examiner, affirmed by the PTO Board). Despite its internal disagreement regarding the claim as supplemented, the PTO was consistent on one point—at no time did the PTO conclude that the five clauses in the original claim, which are the first five of the seven clauses of claim 3, patentably distinguish Lemelson's invention from the prior art.

Lemelson, on the other hand, takes the position in his brief on appeal to this court that the supplemental clauses—clauses [f] and [g]—do nothing to distinguish Gardiol and the other prior art. He argues that the distinctions between claim 3 and the prior art occur in the limitations described in the first five clauses of claim 3. Lemelson justifies this position by suggesting that the Examiner's rejection of the five-clause claim as anticipated by Gardiol simply "did not make sense. Patent examiners, like the rest of us, occasionally make mistakes."

This argument is without merit. During prosecution of the original patent, Lemelson cancelled the five-clause claim in face of the Examiner's rejection, and submitted for allowance the claim with the additional clauses, as suggested by the Examiner. Lemelson cannot acquiesce to a rejection and to an agreed alternative, and now

years later shift his stance 180° to argue for a second bite at the abandoned apple. Other players in the marketplace are entitled to rely on the record made in the Patent Office in determining the meaning and scope of the patent.

The question of whether the original five-clause claim was patentable over Gardiol and the other prior art is thus foreclosed.[5] If reissue claim 3 is distinguishable at all from the prior art, it must be because of something in the added two clauses. The evidence adduced at trial would not allow a reasonable jury to read the prosecution history and the specification any other way.

### 2. Hot Wheels and Infringement

The evidence at trial demonstrated that the Hot Wheels track is basically the same as Gardiol, but without the internal support. Hot Wheels uses external attachments, as does Lemelson, to define the shape of the track for any particular configuration. However, there is no evidence of any other significant difference between Hot Wheels and Gardiol. Both have an upper surface for supporting a movable object. Both are capable of undergoing three-dimensional deformation. Both have longitudinal sides which limit the lateral movement of the movable object. The evidence at bar pointed to nothing in the Hot Wheels track which is not found in Gardiol. Gardiol differs only in having an extra element—the internal core for structural support.

In arguing at trial that the claims of his patent 'read on' the accused device, Lemelson failed to demonstrate that the Hot Wheels track included each claim limitation or its equivalent. The testimony on the point contributed nothing of substance to the language of the claims, e.g., Lemelson testified that clause [f] "adds something to the earlier phrases of the claim and that is that the guide means includes a pair of spaced apart runner portions for defining the pathway of a vehicle moving over the track," and that clause [g] "adds some language to the preceding phrases of the claim by saying that the 'spaced apart runner portions include upwardly extending rails.' ".

As discussed, *supra*, the jury, if its verdict regarding infringement is to be sustained, must have interpreted clauses [f] and [g] to add something to the claim not found in the first five clauses and that is found in Hot Wheels; and if its verdict regarding validity is to be sustained, that something must not be disclosed by Gardiol. But there is no substantive evidence to distinguish Hot Wheels from Gardiol; Lemelson identified no elements in the Hot Wheels track that correspond to limitations [f] and [g]. Absent sufficient evidence in the record to support the conclusion that Hot Wheels is distinguishable from Gardiol, it follows that Hot Wheels could not be found to meet all of the limitations contained in the Lemelson patent, either literally or by equivalents.

We therefore conclude that no reasonable jury could read reissue claim 3 both to be valid in view of Gardiol *and* infringed by Hot Wheels. When properly placed in the context of the prosecution history and the demonstrated meaning of the several clauses of the claim, these are inherently inconsistent conclusions. To the extent the jury so concluded, there was error, and the trial court should have granted the motion for JNOV as to the finding of infringement.[6]

---

5. *Insta–Foam Products, Inc. v. Universal Foam Systems Inc.*, 906 F.2d 698, 15 USPQ2d 1295 (Fed.Cir.1990), cited by Lemelson in his brief, is inapplicable to the facts of the instant case. In *Insta–Foam*, this court upheld the district court's holding that the mere acceptance and rewriting of an allowed dependent claim in independent form did not establish prosecution history estoppel in that case. 906 F.2d at 703–04, 15 USPQ2d at 1298–99. However, the question there was not whether the abandoned broader claim was nevertheless patentable, as Lemelson argues here, but whether, for purposes of determining infringement under the Doctrine of Equivalents, the abandonment evidenced intent regarding a limitation which was already in the claim before the amendment, and which was not disclosed by the prior art at issue. 906 F.2d at 703 & n. 3, 15 USPQ2d at 1299 & n. 3.)

6. Due to the posture of the case on appeal, the question of whether the patent is valid, even though not infringed, is not before us.

### III. CONCLUSION

We reverse the judgment entered by the District Court on the issue of infringement.

## COSTS

Each party is to bear its own costs.

REVERSED.